**ACME MARKETS, INC., Plaintiff,**

v.

**WHARTON HARDWARE AND SUPPLY CORPORATION, Defendant.**

**WHARTON HARDWARE AND SUPPLY CORPORATION, Giant Food, Inc., Giant Construction Company, Inc., and Giant of Maryland, Inc., Plaintiffs,**

v.

**ACME MARKETS, INC., and Jarnap Company, Inc., Defendants.**

Civ. A. Nos. 94–2969 (JBS), 94–4133 (JBS).

United States District Court,
D. New Jersey.

March 22, 1995.

On Motion For Reconsideration
March 28, 1995.

Edward S. Wardell, Voorhees, NJ, and Scott D. Patterson, Saul, Ewing, Remick & Saul, Malvern, PA, for Acme Markets, Inc.

Allison E. Accurso, Fox, Rothschild, O'Brien & Frankel, Lawrenceville, NJ, for Jarnap Co., Inc.

Carl C. Hittenger, Philadelphia, PA, and Martin C. Bryce, Jr., Ballard Spahr Andrews & Ingersoll, Camden, NJ, for Wharton Hardware and Supply Corp., Giant Food, Inc., Giant Const. Co., and Giant of Maryland, Inc.

## OPINION

SIMANDLE, District Judge:

The parties come before the court to dispute the validity of a restrictive covenant which purports to prevent the owners and lessees of land situated in Medford, New Jersey from operating a supermarket. Each party brought an action to protect its rights and the two actions have been consolidated. Presently, the court must address a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., brought jointly by Acme Markets, Inc. and Jarnap Corporation.

## I. BACKGROUND

Formerly, the properties at issue were part of a 111–acre farm owned by Donald M. Singer and his wife ("the Singers"). The farm straddled Route 70 in Medford, New Jersey. When the Singers sold approximately 12 acres of their farm ("the dominant estate") to American Stores Company ("ASC") on June 25, 1957, they included the following covenant in the deed:

> The grantor, for himself, his heirs and assigns, during the time the property herein conveyed is occupied and operated as a Super food store, hereby agrees not to use, let or sublet, or to permit the use, letting, or subletting of grantor's remaining lands, of which the above described parcel was a part, for the sale or storage of food, except that the foregoing shall not apply to the sale or storage, or to the offering for sale of food above restricted, in connection with the operation of a luncheon counter, soda fountain, restaurant, or of an eating place where said restricted items are consumed on the premises of such business. This restriction shall run with the land and be binding upon grantor, his heirs, personal representatives, grantees, successors and assigns.

Whether consideration was paid for the covenant is disputed. On July 30, 1958, ASC conveyed the dominant estate to Jarnap Company, Inc. ("Jarnap") who then leased the land back to ASC.

Jarnap then built a 16,800 square foot supermarket which opened on June 24, 1959. In 1979, Jarnap constructed the Medford Shopping Center on the dominant estate to replace the old supermarket. The newly constructed facility contained a 32,200 square foot supermarket leased by ASC, and other stores. Currently, Jarnap owns the Medford Shopping Center and leases the supermarket to ASC who operates the store through its subsidiary Acme Markets, Inc. ("Acme").

Throughout the 1950's and 1960's, the Singers sold portions of their remaining 100 acres. On February 17, 1969, the Singers sold 24 acres bordering on Route 70 ("the servient estate") to Angelo D. Rinaldi and Eugene Rinaldi subject to the restrictive covenant contained in the deed from the Singers to ASC. After several conveyances, Sharp's Run Associates ("SRA") purchased the servient estate. SRA developed a shopping center on the land, known as Sharp's Run Shopping Center ("Sharp's Run"). After experiencing financial troubles, SRA sold the ser-

vient estate, subject to all covenants of record, to Wharton Hardware and Supply Corporation ("Wharton"), the current owner.

In early 1994, the anchor tenant in Sharp's Run, a Jamesway department store, liquidated its inventory and closed its doors. Wharton then searched for a replacement anchor tenant. Wharton alleges that Acme negotiated with Wharton for a lease covering the former Jamesway site. After a tentative agreement was reached, the negotiations fell through. In June 1994, Wharton entered into a lease with Giant Food, Inc. ("Giant") for the former Jamesway site. Because Giant and Wharton assume the covenant to be invalid, Giant intends to construct a sixty-thousand-square-foot supermarket on the leased premises.

On June 23, 1994, Acme filed a verified complaint against Wharton to validate the covenant and to enjoin the construction and operation of the proposed supermarket. In its complaint Acme requests declaratory relief under New Jersey law, preliminary and permanent injunctive relief, and in the alternative, damages for the alleged breach of the restrictive covenant.

On August 11, 1994, Jarnap filed a complaint in the Superior Court of New Jersey, Burlington County, seeking declaratory and injunctive relief against Wharton under New Jersey law. Jarnap agreed to stay its state court action pending a determination by this court.

On August 25, 1994, Wharton filed a complaint in this court against both Acme and Jarnap. Wharton does not request injunctive relief in its complaint, but instead requests declarations that the restrictive covenant is invalid and unenforceable under federal and New Jersey antitrust law and New Jersey common law, and it requests attorney's fees.

The two cases were consolidated on November 3, 1994. Pursuant to Wharton's motion, on January 19, 1995, the court issued an order to show cause why a preliminary injunction should not issue. On January 20, 1995, Magistrate Judge Rosen entered a scheduling order mandating that the parties complete all pretrial discovery by February 10, 1995. The preliminary injunction motion was consolidated with trial on the merits pursuant to Rule 65(a)(2), Fed.R.Civ.P., on February 2, 1995, upon application by Acme and Jarnap. Following consolidation of the cases and of the preliminary injunction hearing with trial on the merits, Wharton and Giant have been designated as the plaintiffs and Acme and Jarnap as the defendants. The claims by Jarnap to uphold the restrictive covenant are designated as counterclaims.

The trial is presently scheduled for March 28, 1995, and the present summary judgment motions are before the court upon shortened notice. Oral argument on the summary judgment motions was held on March 10, 1995, at which time the court reserved decision.

At the oral argument, the court granted Wharton's application for leave to file an amended complaint[1], naming Giant Food, Inc. and related entities Giant Construction Co., Inc. and Giant of Maryland, Inc. (hereinafter collectively referred to as "Giant") as its co-plaintiffs. The amended complaint was filed on March 13, 1995 and contains six counts. In counts one and four, Wharton and Giant respectively seek a declaration that the restrictive covenant at issue is invalid and unenforceable because the covenant violates Sections 1 & 2 of the Sherman Antitrust Act. In counts two and five, Wharton and Giant respectively seek a declaration that the covenant is unreasonable and unenforceable under New Jersey common law. Finally, Wharton and Giant seek, in counts three and six respectively, a declaration that the restrictive covenant is invalid and unenforceable because it violates the New Jersey Antitrust Act, N.J.S.A. §§ 56:9–3 & 56:9–4.

1. Leave to add Giant as a co-plaintiff with Wharton was granted because Giant had been a participant in the case all along, although unnamed. Giant has funded the litigation, according to Wharton's counsel, it has supplied witnesses for depositions, and has furnished numerous discovery documents. The formal amendment follows an informal understanding among the parties regarding Giant's status and its agreement to be bound by the results of the litigation to the same extent as if it were a party allied with Wharton.

## II. DISCUSSION

### A. *Antitrust Standing*

As a preliminary matter, the defendants argue that Wharton lacks antitrust standing to challenge the restrictive covenant. Although Wharton alleges that this court has jurisdiction under Section 4 of the Clayton Act, 15 U.S.C. § 15(a)[2], Wharton does not base its claims for relief on the Clayton Act. That is, Wharton requests neither treble damages under Section 4 nor injunctive relief under Section 16, 15 U.S.C. § 26[3]. Instead, Wharton requests a declaration that the restrictive covenant violates Section 1 and Section 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2.

The fact that Wharton seeks a declaratory judgment and not damages or injunctive relief does not automatically preclude Wharton's claims. Where the court would have jurisdiction to entertain Wharton's antitrust claims if an injunction or money damages were sought, the court has jurisdiction to entertain a declaratory judgment action alleging violation of the same statutes. *See Schilling v. Rogers,* 363 U.S. 666, 677, 80 S.Ct. 1288, 1295–96, 4 L.Ed.2d 1478 (1960); *Jersey Central Power & Light Co. v. Local Unions,* 508 F.2d 687, 699 n. 31 (3d Cir.), *cert. denied,* 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1975); *La Maina v. Brannon,* 804 F.Supp. 607, 611 (D.N.J.1992). Therefore, Wharton may seek a declaratory judgment that the covenant violates the Sherman Antitrust Act if Wharton would be able to bring an action for either damages or for injunctive relief.

The Third Circuit has summarized the prevailing test the Supreme Court used to determine antitrust standing in *Associated*

*General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), as follows:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause the harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144, 1165–66 (3d Cir. 1993), *cert. denied sub nom. Bessemer and Lake Erie R. Co. v. Wheeling–Pittsburgh Steel Corp.,* —— U.S. ——, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994). At the heart of the antitrust standing inquiry is whether the party bringing the claim is the proper party to bring a private antitrust action. *See Associated Gen. Contractors,* 459 U.S. at 535 n. 31, 103 S.Ct. at 907 n. 31. Thus, courts generally find that competitors and consumers are proper parties because the antitrust laws are intended to protect "the economic freedom of participants in the relevant market." *Id.* at 538, 103 S.Ct. at 908. A threshold inquiry is whether the party bringing the action has suffered antitrust injury. Thus, we begin to determine standing in this case by looking to the first three of the *Associated General Contractors* factors which focus on the existence of antitrust injury[4]. *See Cargill,* 479

---

**2.** "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

**3.** "Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened

loss or damage by a violation of the antitrust laws...." 15 U.S.C. § 26

**4.** Wharton contends that it seeks injunctive relief pursuant to Section 16 of the Clayton Act, and thus, we must use a more liberal standard to determine its standing. Wharton's attempt to distinguish the line of standing cases under Section 4, does not work. Though the precise standing inquiries are different depending upon whether injunctive relief or treble damages is sought, at minimum, the litigant must demonstrate an antitrust injury. *See Cargill, Inc. v.*

U.S. at 112 n. 8, 107 S.Ct. at 490 n. 8; *Allen–Myland, Inc. v. International Bus. Mach. Corp.*, 33 F.3d 194, 201 (3d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994).

Acme argues that Wharton's injuries do not result from the anti-competitive nature of Acme's actions, even if we assume that enforcement of the covenant violates the antitrust laws and that Wharton has been harmed by the enforcement of the covenant. Because Wharton is a commercial landlord and not a participant in the retail grocery market, Acme contends that Wharton is not injured by the alleged antitrust violation and is not a proper party to bring the action. Acme's position is well supported by case law. For example, a shopping center owner's injuries from an alleged restraint of trade in the retail supermarket industry have been held to be too remote and indirect to support standing under Section 4 of the Clayton Act. *Randolph Assoc. v. Wakefern Food Corp.*, 1982 WL 1819 (D.N.J.1982). Other courts have concluded that no standing existed in factually similar circumstances. *See Rosenberg v. Cleary, Gottlieb, Steen and Hamilton*, 598 F.Supp. 642, 645–46 (S.D.N.Y. 1984) (owner of supermarket development did not have standing under Section 4 of the Clayton Act to challenge restraint of trade in retail grocery business); *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1087 (6th Cir.1983) (lessor of commercial premises did not have antitrust standing to challenge alleged violation of section 2 of the Sherman Act in the retail grocery industry); *Henke Enter., Inc. v. Hy-Vee Food Stores, Inc.*, 749 F.2d 488, 490 (8th Cir.1984) (hardware store tenant in shopping center lacked standing to bring antitrust action against vacating tenant who allegedly restrained trade in retail grocery market through restrictive covenant in assignment of lease).

■ Although Wharton's alleged injury may have been an incidental by-product of the alleged anti-competitive conduct, it is sufficiently remote from the effects on the retail grocery market to preclude standing under the antitrust laws. Wharton is not a participant in the relevant market, and does not on the facts presented sustain antitrust injury from the alleged violation.

Furthermore, any injury would be speculative at best. Although the restrictive covenant is a cause in fact of Wharton's inability to currently lease its anchor store to a supermarket, it is not the proximate cause of the injury Wharton suffers. Rather, the vacancy created by Wharton's former tenant, Jamesway, is arguably the most significant factor contributing to Wharton's vacancy. Certainly, other supply and demand factors have affected Wharton's inability to lease its anchor space, which is equally suitable for use as a department store, home center or building supply store, and may possibly support other establishments. Nothing at issue in this case prevents Wharton from functioning as a commercial landlord to lease space for any kind of store other than a supermarket.

Under the facts presented, Wharton cannot demonstrate antitrust injury and is not a proper party to maintain an antitrust suit. Therefore, we hold that Wharton lacks standing under the Clayton Act to challenge the disputed covenant. Accordingly, Wharton's claims based on the Clayton Act and the Sherman Antitrust Act must be dismissed for lack of standing.

■ Although Wharton will be dismissed as a party to the antitrust claims, its co-plaintiff Giant has standing to pursue the antitrust claims. The court does not have the same problems with Giant's antitrust standing as it has with Wharton's antitrust standing. That is, Giant alleges it is a competitor in the relevant market, will be directly affected by the alleged anti-competitive conduct, and will suffer injury which the antitrust laws seek to address. Thus, to the extent defendants Jarnap and Acme seek to dismiss the antitrust claims of Wharton and Giant for lack of standing, the motions are granted with respect to Wharton [5] and denied as to Giant.

*Monfort of Colorado, Inc.*, 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986).

**5.** Although we dismiss Wharton's antitrust claims, we retain jurisdiction over Wharton's state common law claims pursuant to 28 U.S.C. § 1367(a). First, Wharton can not satisfy the

### B. *The Summary Judgment Standard*

On a motion for summary judgment, the burden is on the moving party to show that no genuine issue of material fact exists. *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d Cir.1987); Fed.R.Civ.P. 56. In considering such a motion, the court views the record in the light most favorable to the non-moving party. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983); *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981). An issue is genuine when the evidence proffered by the non-moving party is such that a reasonable fact finder could find for that party. *Equimark*, 812 F.2d at 144. Federal Rule of Civil Procedure 56(e) provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Under this rule, we must award summary judgment on all properly supported issues identified in a movant's motion except for those for which the non-movant provides evidence in the form of affidavits, pleadings, depositions, answers to interrogatories or admissions on file to show that a question of material fact remains.

### C. *Sherman Antitrust Act § 1* [6]

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination ..., or conspiracy in restraint of trade or [interstate] commerce." 15 U.S.C. § 1. To establish a Section 1 claim, the claimant must establish concerted action and unreasonable [7] restraint of trade. *Fineman v. Armstrong World Indust., Inc.*, 980 F.2d 171, 213 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993).

#### 1. *Concerted Action*

To prove concerted action, the claimant must show proof of a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.*, 579 F.2d 20, 33 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). If the evidence present-

---

requirements of 28 U.S.C. § 1332, because, as New Jersey Corporations, Wharton and Jarnap are not diverse. However, we may properly exercise supplemental jurisdiction in this case because we have original jurisdiction over Giant's antitrust claims under 28 U.S.C. § 1337, and Wharton's claims are so related to Giant's claims "that they form part of the same case or controversy under Article III of the United States." 28 U.S.C. § 1367(a). We further note that interests of judicial economy and fairness to the litigants warrant retention of supplemental jurisdiction over Wharton's state law claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1284 (3d Cir.1993).

**6.** Because New Jersey's antitrust statutes are construed in harmony with the federal antitrust statutes, we will not separately address the validity of those claims here. *See* N.J.S.A. § 56:9–18; *Regency Oldsmobile, Inc. v. General Motors Corp.*, 723 F.Supp. 250, 270 (D.N.J.1989).

**7.** The plaintiffs repeatedly cite the Third Circuit decision in *Harold Friedman Inc. v. Thorofare*

---

*Markets Inc.*, 587 F.2d 127 (3d Cir.1978) for the proposition that the validity of antitrust claims cannot be determined on summary judgment. The plaintiffs have clearly misinterpreted this decision.

Earlier in the opinion the court recognized that "the Supreme Court has instructed that 'summary procedures should be used sparingly in antitrust cases.'" *Id.* at 141 (quoting *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)). The court then held that "the unreasonableness of the conduct under attack cannot be determined on a motion for summary judgment." *Id.* at 142. Plaintiff chops up this latter quote, removes it from its contextual moorings, and concludes that the Third Circuit announced an absolute prohibition against summary judgments in Section 1 cases. Plaintiffs' interpretation of *Harold Friedman* overstates the Third Circuit's holding. At most, *Harold Friedman* emphasizes caution. It does not prohibit the award of summary judgment in an appropriate Section 1 case.

ed on summary judgment is equally consistent with legal and illegal conduct, the inference of antitrust conspiracy is not supported. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1231 (3d Cir.), *cert. denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc.*, — U.S. ——, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). However, if a rational fact finder could find that Acme and Jarnap shared a common objective to restrain competition and took action calculated to achieve that objective, despite differing motives, we must deny the defendant's motion for summary judgment. *See Fineman*, 980 F.2d at 212.

The plaintiffs characterize Acme's and Jarnap's desire to enforce the covenant as "concerted action" under Section 1. The defendants cite to an unpublished Northern District of Illinois case for the proposition that the "confluence of interests" of anchor tenant and shopping center landlord is insufficient, by itself, to establish an illegal antitrust conspiracy. *Serfecz v. Jewel Food Stores, Inc.*, 1994 WL 478576 (N.D.Ill.1994). However true this proposition may be, the facts present here do not justify the conclusion that as a matter of law plaintiffs cannot establish a Section 1 violation. The plaintiffs allege more than concerted action resulting from the interdependent profitability of a landlord and its anchor tenant. The concerted action alleged here arises from the defendants seeking enforcement of a restrictive covenant which prevents the operation of a competing supermarket.

Acme and Jarnap maintain that each of them have separate and independent rights and interests and have pursued them independently. However, the alleged independent motivations are insufficient to eliminate the plaintiffs' potential for success on their Section 1 claim. *See Fineman*, 980 F.2d at 212. That is, viewing the evidence in a light most favorable to the plaintiffs as non-movants, a rational fact finder could find that despite their independent motives, Acme and Jarnap acted in concert to restrain competition through their common objective of enforcing the restrictive covenant.

### 2. Unreasonable Restraint of Trade

■ To establish an unreasonable restraint of trade, the claimant must demonstrate that the alleged combination produced anti-competitive effects within the relevant product and geographic markets. *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). The burden to establish the relevant markets is on the claimant. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177–78, 86 S.Ct. 347, 350–51, 15 L.Ed.2d 247 (1965); *Tunis*, 952 F.2d at 724; *Hudson's Bay Co. Fur Sales Inc. v. American Legend Co-op.*, 651 F.Supp. 819, 835 (D.N.J. 1986).

#### a. Relevant Product Market

■ The relevant product market is defined as those "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). Plaintiffs argue that the relevant product market includes only "conventional markets and super food stores whose primary function is to sell food and grocery related items to consumers for at-home consumption." In response, Acme concedes for the purposes of summary judgment that plaintiffs' definition of the relevant product market is correct. Although the definition of the relevant market remains in dispute for trial, we will assume for purposes of this motion that the relevant market is accurately described as conventional markets and super food stores whose primary function is to sell food and grocery related items for at home consumption.

#### b. Relevant Geographic Market

■ The relevant geographic market is the area in which potential consumers ordinarily look to buy the products offered by the business. *Tunis*, 952 F.2d at 726. The geographic market used must conform to commercial reality. *Brown Shoe Co. v. United States*, 370 U.S. 294, 336, 82 S.Ct. 1502, 1529–30, 8 L.Ed.2d 510 (1962). In the present

case, the central dispute about geography is whether to include "super-store-abundant" Marlton in the relevant geographic market.

Acme claims that the relevant geographic market extends well beyond Medford and includes Marlton. Acme points to the testimony of plaintiffs' own expert who stated that 50% of available food dollars leave Medford for other areas, strongly suggesting that plaintiffs' definition of a small Medford-based market consisting of three supermarkets is woefully undersized compared with the reality that 50% of the food dollars of the area's residents are spent elsewhere. Acme states that the Marlton stores are less than ten minutes away from the Medford Acme, connected by a five-mile drive on Route 70, Medford's principal highway and the main artery for commuting from the surrounding suburbs to Philadelphia and points west.

Plaintiffs insist that the geographic boundaries of the relevant market do not include Marlton. Rather plaintiffs argue that the relevant geographic market includes only Medford, Medford Lakes, Shamong, Southampton, Tabernacle, and part of Evesham. Each side has produced voluminous expert testimony in the form of deposition evidence and expert reports.

■ A thorough review of all the submissions leads us to conclude that Marlton must be included in the relevant geographic market in order to conform our analysis to commercial reality. The evidence presented demonstrates that the relevant geographic market is larger than the Medford area. However, the precise contours of the relevant market remain in dispute. Under plaintiffs' geographic market definition, it is undisputed that nearly one million dollars per week of the food purchasing money of potential consumers is expended outside of plaintiffs' alleged relevant market. Under plaintiffs' scenario, a grocery store in the relevant geographic market could not appreciably raise its prices or curtail its supply without losing significant market share to other stores outside plaintiffs' narrowly drawn geographic market. Although the facts show that no reasonable fact finder could conclude

that the relevant geographic market is as small as plaintiffs suggest, the exact size of the geographic market remains a disputed genuine issue of material fact.[8]

### c. Injury to Competition—Market Power

■ To carry their burden plaintiffs must demonstrate some harm to competition in the relevant market. That is, an antitrust claimant must prove that the challenged conduct affects the prices, quantity, or quality of goods supplied. *Tunis,* 952 F.2d at 728. To demonstrate market power the claimant may attempt to prove market share which conclusively proves injury to competition, but other factors such as the ease of entry into the relevant market may also be important. *See Allen–Myland,* 33 F.3d at 209.

Acme presents the findings of its expert, Todd A. Morrison, who concludes that Acme does not have the ability to control prices or restrict supply. A second Acme expert, William B. Burnett, states that the prices Acme charges at its Medford store are generally the same as it charges at all of its stores throughout the Delaware Valley.

In addition, Morrison calculated Acme's market share in ten possible relevant geographic markets. The results show that Acme's market share ranges between 9.6% and 31.6% depending upon the number of stores included in the relevant geographic market. In contrast, plaintiffs contend that Acme has a market share of 40% of the relevant geographic market. Not only the size of Acme's market share, but also the effect of that share on Acme's ability to control prices or restrict supply is hotly contested, and incapable of resolution without a searching investigation of the credibility of the dueling experts.

■ Plaintiffs and Defendants each base their determination of Acme's market share on the geographic market they claim is relevant. Therefore, we must of necessity conclude that a genuine and material factual dispute exists as to Acme's market share

---

8. In fact, Acme's expert stated: "I cannot identify with precision the outer bounds of the geographic market." *See* Declaration of William B. Burnett at 29 n. 34.

because we have determined that the size of the relevant geographic market is in dispute.

Furthermore, the parties dispute the existence of alternative sites for new supermarket development. The plaintiffs state that no alternative sites currently exist in the relevant geographic market upon which a modern superstore could be built and operated. The defendants contend that several other sites are available for supermarket development. We find that a factual dispute exists as to whether alternative sites are available within the relevant geographic market and whether a barrier to the entry of new competition exists. Thus, we must deny the defendants' motion for summary judgment on plaintiffs' Section 1 claim[9], and Giant's claims under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and under the New Jersey Antitrust Act, N.J.S.A. § 56:9–3, may go to trial.

### D. *Sherman Antitrust Act § 2*

■ The defendants also seek summary judgment against plaintiffs' claims under Section 2 of the Sherman Antitrust Act. To establish an attempt to monopolize under Section 2, plaintiffs must demonstrate: (1) the defendant has engaged in predatory or anti-competitive conduct with (2) a specific attempt to monopolize and (3) sufficient market power to create a dangerous probability of achieving monopoly power within the relevant geographic and product markets. *Spectrum Sports, Inc. v. McQuillan*, —— U.S. ——, —— – ——, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir.1994).

■ Courts primarily look to the size of a defendant's market power to determine whether a defendant presents a dangerous probability of gaining monopoly power. *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). Nevertheless, other factors considered include the strength of competition, projections on industry development, barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand. *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir.1992).

■ The leading antitrust commentators have stated that "the basic thrust of the classic rule is the presumption that attempt does not occur in the absence of a rather significant market share." 3 Phillip Areeda & Donald F. Turner, *Antitrust Law* ¶ 820 (1978). What constitutes a market share significant enough to demonstrate a dangerous probability of attaining monopoly power has not been clearly defined in case law. *Id.* ¶ 835c. Areeda and Turner have suggested a rule of thumb for determining whether a particular market share may be indicative of a dangerous probability of achieving monopoly power. *See id.* For defendants who control 30% or less of the relevant market, claims of attempted monopolization should be "presumptively" rejected. Where a defendant has a market share in the range of 30–50%, attempt claims should be rejected unless the defendant's conduct strongly suggests an ability to garner monopoly power. When the defendant controls 50% or more of the market, anti-competitive conduct is conclusively presumed by Areeda and Turner to constitute attempted monopolization. *Id.*

■ Although they are not rigid rules of law, the views of these oft-cited commentators, when applied in conjunction with prevailing case law, create a useful framework for analyzing Section 2 claims of attempted monopolization. Applying this framework to the present case, we conclude as a matter of law that Acme does not present a dangerous probability of obtaining monopoly power based upon the undisputed facts, and giving the plaintiffs the benefit of favorable inferences.

Our previous conclusion that genuine issues of material fact exist on the question of Acme's market share does not preclude a finding as to plaintiffs' Section 2 claim. Even if we view the evidence in a light most favorable to the plaintiffs and accept plaintiffs conclusion that Acme has a 40% share of

---

9. We also hold that summary judgment is inappropriate on plaintiffs claims under New Jersey Antitrust Act, N.J.S.A. § 56:9–3.

the relevant geographic market, we find that no reasonable fact finder could conclude that Acme has a dangerous probability of achieving monopoly power.

When Acme's market share is considered in conjunction with the nature of the alleged anti-competitive conduct, Acme does not present a dangerous probability of gaining monopoly power as a matter of law. That is, by seeking enforcement of the restrictive covenant, Acme can only prevent the entrance of one competitor at one location. Acme cannot increase its market share by this conduct, it can only protect the market share it currently enjoys. As a matter of law, the plaintiffs cannot demonstrate a dangerous probability that Acme will achieve monopoly power because Acme's conduct cannot increase its market share. Without the potential to increase market share from its current non-monopoly level, the plaintiffs cannot prove their claims under Section 2 of the Sherman Antitrust Act. *Cf. Pennsylvania Dental,* 574 F.Supp. at 472 (holding that without evidence of acts which tend to result in a monopoly, a 40% market share did not create a dangerous probability of success in monopolizing a market). Thus, we will grant defendants' motion for summary judgment on plaintiffs' claims under Section 2 of the Sherman Antitrust Act.[10]

### E. *Validity of the Restrictive Covenant Under New Jersey Law*

The defendants Acme and Jarnap seek summary judgment declaring that the restrictive covenant creates a valid and enforceable burden upon the Wharton Parcel according to New Jersey law. The controlling case on this issue is *Davidson Bros., Inc. v. D. Katz & Sons, Inc.,* 121 N.J. 196, 579 A.2d 288 (1990). In *Davidson,* the New Jersey Supreme Court joined the majority of courts who use a reasonableness test to evaluate the validity of restrictive covenants. The plaintiff in Davidson owned two supermarkets in New Brunswick. The two stores competed with one another and as a result, neither was profitable. The plaintiff then closed one store and sold the land on which the closed store was situated to the defendant subject to a restrictive covenant not to operate a supermarket on the land for a period of forty years. When a subsequent lessee of the burdened land sought to operate a supermarket, the plaintiff brought suit to enforce the covenant.

■ The court held that the reasonableness of the covenant should determine whether or not it was valid:

> Courts today recognize that it is not unreasonable for parties in commercial-property transactions to protect themselves from competition by executing noncompetition covenants. Businesspersons, either as lessees or purchasers may be hesitant to invest substantial sums if they have no minimal protection from a competitor starting a business in the near vicinity. Hence, rather than limiting trade, in some instances, restrictive covenants may increase business activity.

*Id.* at 210, 579 A.2d at 295. Pursuant to *Davidson,* courts should consider whether: 1) the parties had a lawful intent when the covenant was drafted; 2) the covenant was part of the consideration for the sale of the property; 3) the restriction was clearly and expressly stated; 4) the covenant was written and recorded, so that the subsequent grantee had actual notice of the covenant; 5) the covenant is reasonable concerning the time, area, or duration; 6) the covenant imposes an unreasonable restraint on trade or secures a monopoly for the beneficiary of the restriction; 7) the covenant interferes with the public interest; and 8) circumstances have changed so that enforcement would be unreasonable. *Id.* at 211–12, 579 A.2d at 295. In applying these factors to the present case, we must not "turn a blind eye to whether [this] covenant has become unreasonable over time." *Id.* at 212, 579 A.2d at 296.

#### 1. *Intent*

The intent of the parties is uncontested. At the time of the sale in 1957, the Singers intended to restrict the land they retained

**10.** We likewise grant summary judgment with respect to plaintiffs' attempted monopolization claims brought pursuant to N.J.S.A. § 56:9–4.

for the benefit of the land they sold to ASC for as long as a super food store was operated on the dominant estate. Therefore, we find that no substantial controversy exists as to the intent behind the restrictive covenant and at trial the intent shall be deemed established [11]. *See* Fed.R.Civ.P. 56(d).

### 2. Consideration

Wharton argues that ASC did not pay for the covenant when it purchased the property from the Singers. Wharton contends that ASC paid about the same price per acre as other purchasers of property from the Singers paid for their respective parcels. Acme argues that the covenant was a fundamental part of the deal. Acme contends that ASC would not have purchased the property if it did not receive the benefit of the restriction because the property was a risky new investment in rural land set apart from the existing commercial center of Medford.

Whether consideration was in fact paid for the covenant remains a genuine issue of material fact for trial. On this issue Acme presents the deposition testimony of William Drebelbis, the real estate representative for ASC who negotiated the purchase of the property. Drebelbis contends that ASC agreed to what was considered a high price for the land at that time on the condition that the Singers agree to the restrictive covenant. Ephraim Tomlinson, II, the Singer's attorney for the transaction, confirms in his deposition that ASC would not have done the deal without the restrictive covenant.

As evidence that Acme did not value the restriction highly, Wharton cites the lease-back transaction between Jarnap and Acme which recited a one dollar consideration for a mirror image restrictive covenant in Acme's lease. In addition, Wharton cites to the price per acre paid by the Singer's subsequent grantees who did not receive the benefit of the covenant, as roughly equivalent to the price paid by Acme. Thus, Wharton contends that Acme did not provide separate consideration for the covenant. Viewing the evidence in the light most favorable to the plaintiffs as non-movants, we conclude that a reasonable fact finder could find that Acme did not pay consideration for the covenant. Therefore, a genuine issue of material fact remains for trial which precludes summary judgment on the reasonableness of the covenant under New Jersey law.

### 3. Clarity

The covenant clearly expresses the parties' intent. The covenant prevents the owner or lessee of the servient estate from operating a store which sells food for off premises consumption as long as the owner or lessee of the dominant estate operates a super food store.

 Plaintiffs argue that the use of the term "Super food store" makes the covenant ambiguous. Although the term is imprecise, the use of this term does not render the entire covenant void for ambiguity. Courts interpreting contractual language in older documents must inevitably confront terms which have fallen out of common usage. Frequently, terms which may have been clear to the drafters, confound future readers. In interpreting such terms, "[t]he court's function is to assess what was written in the context of the circumstances under which it was written, and accord to language a rational meaning in keeping with the express general purpose." *Regan v. Regan,* 246 N.J.Super. 473, 478, 587 A.2d 1330 (Ch. Div.1990). Acme provided case citation in its brief in opposition to Wharton's preliminary injunction motion, which indicates that the term "super food store" was, at the time the restrictive covenant was drafted, the functional equivalent of the now common term, supermarket. *See, e.g., Elida, Inc. v. Harmor Realty Corp.,* 177 Conn. 218, 413 A.2d 1226, 1227 (1979) (construing a lease dated 1970 which contained reference to "super food markets"); *Murphy v. J.L. Saunders, Inc.,* 202 Va. 913, 121 S.E.2d 375 (1961) (analyzing claim of customer injured in a "super food market"); *Schaub's, Inc. v. Department of Alcoholic Beverage Control,* 153 Cal. App.2d 858, 315 P.2d 459, 461 (1957) (involv-

---

**11.** The parties do not specifically address whether the covenant interfered with antitrust laws or public policy at the time the covenant was created. Nevertheless, at trial the parties are not precluded from contesting the extent to which the covenant restrained trade in 1957, under the restraint of trade, public policy, or changed circumstances factors discussed *infra.*

ing transfer of liquor license to a "super food market"). Nothing submitted by the plaintiffs brings this fact into dispute. Thus, for the purposes of our inquiry into the clarity of the covenant, we hold that the term "super food store" is the functional equivalent of the common term supermarket.

Furthermore, New Jersey's rule of strict construction for interpreting real covenants is relaxed where strict construction would defeat the obvious purpose of the restriction. *Murphy v. Trapani*, 255 N.J.Super. 65, 72, 604 A.2d 635 (App.Div.), *certif. denied*, 130 N.J. 17, 611 A.2d 655 (1992); *Bruno v. Hanna*, 63 N.J.Super. 282, 287, 164 A.2d 647 (App.Div.1960). "The precise form of the covenant is of little consequence if the intent is reasonably clear, and its apparent purpose should not be defeated by a technical construction of the language used." *Murphy*, 255 N.J.Super. at 72, 604 A.2d 635. We decline to find ambiguity in the use of the term "super food store" which would in any way render the covenant at issue unclear. Therefore, we hold that the circumstances surrounding its creation and the language of the covenant demonstrate with sufficiently reasonable clarity the intent, purpose and effect of the restriction.

### 4. Notice

The covenant was expressly set forth in a recorded deed. When the Singers sold the servient estate they specifically referred to the restrictive covenant. Wharton purchased the servient estate subject to all covenants of record. Wharton admits that it had actual notice of the restriction when it purchased the servient estate. Furthermore, there is no reason to believe that the price paid by Wharton for its land did not reflect the burden of the restrictive covenant. Therefore, we find that no genuine issue of material fact remains for trial on the issue of notice.

### 5. Reasonableness of Scope

The covenant at issue burdens 100 acres. However, Wharton's parcel, arguably the only relevant burdened estate, comprises 24 acres of land directly across the street from the dominant estate. "In commercial settings such as seller and purchaser, as distinguished from employer-employee contracts containing territorial restrictions against post-employment competition, restrictions in excess of five miles have been upheld." *Alexander's Dep't Stores of New Jersey, Inc. v. Arnold Constable Corp.*, 105 N.J.Super 14, 27, 250 A.2d 792, 798–99 (Ch. Div.1969). The restriction did not purport to burden all lands that the grantor owned or thereafter acquired, but rather sought to burden only those lands which were part of the Grantor's farm at the time of the sale. Most importantly, the lands burdened by the covenant were only those lands which could be considered "neighboring parcels". We hold that the geographic scope of the covenant was reasonable because it restricted the operation of a food store only on those neighboring lands which were part of the Singer Farm at the time the covenant was drafted in 1957.[12]

Covenants that extend for perpetuity may often be unreasonable. However, within the realm of employer's non-competition covenants, where the geographic scope of the covenant is reasonable there need be no limitation as to time. *See Heuer v. Rubin*, 1 N.J. 251, 256–57, 62 A.2d 812, 814 (1949)[13]. Furthermore, non-competition covenants in leases which are co-extensive with the lease term have been upheld without an inquiry into the reasonableness of the duration of the lease term. *See, e.g., Alexander's*, 105 N.J.Super. at 27, 250 A.2d at 798–99 (citing cases). Because the covenant at issue was designed to last as long as the dominant estate operates a food market, we hold that

12. By this holding we do not express any opinion as to the reasonableness of the geographic scope of the covenant in light of changed circumstances. This issue remains for trial in light of our holding that a genuine issue of material fact exists as to whether alternative sites exist for supermarket development.

13. The court in *Davidson* recommended that trial courts borrow analogous authority from cases determining the validity of employee non-competition covenants for use in analyzing the reasonableness of real covenants. *Davidson*, 121 N.J. at 212, 579 A.2d at 296.

the covenant was reasonable as to duration at the time the covenant was drafted.[14]

### 6. Restraint on Trade

We next consider whether the covenant imposes an unreasonable restraint on trade or secures a monopoly for the covenantor. "This may be the case in areas where there is limited space available to conduct certain business activities and a covenant not to compete burdens all or most available locales to prevent them from competing in such an activity." *Davidson*, 274 N.J.Super. at 162, 643 A.2d at 644.

The parties take the same positions here as they take with respect to the antitrust claims discussed above. As we have determined that the validity of the covenant under the federal and New Jersey antitrust laws remains in dispute, those issues necessarily involving several material factual disputes, we cannot determine for the purposes of New Jersey's reasonableness test whether the covenant unreasonably restrains trade. Furthermore, there exists a genuine dispute as to whether the Wharton parcel is the only viable location for a new supermarket in Medford.

### 7. Public Interest

This case involves the public interest in the integrity of real estate contracts and the interest in unrestrained competition. In *Davidson*, the New Jersey Supreme Court cautioned that the fact sensitive nature of resolving the reasonableness of public interest arguments makes summary judgment inappropriate. *Davidson*, 121 N.J. at 215, 579 A.2d at 297. Although we do not believe that the court has laid down a blanket prohibition of summary judgments in these cases, we conclude that genuine issues of material fact exist with regard to the reasonableness of this covenant in light of the competing public interests in this case.

As we noted above, a genuine issue of material fact remains concerning the consideration exchanged for the covenant. Viewing the facts favorably to the plaintiffs, we conclude that a reasonable fact finder could find

that the covenant adversely affects the public interest in the free transferability of land and the sale of goods to consumers in a competitive market, and does not undermine the public interest in the validity of land restrictions.

In 1957, it is alleged that Medford would not have had the benefit of a new supermarket without the covenant here at issue. The covenant provided ASC with a measure of security which mitigated the risk of locating out on rural Route 70. However, the Medford Acme has been in existence for over thirty-five years during which time Medford's population has increased six-fold since 1958. Although in 1957 rural Medford may have offered unlimited development potential, Medford's landscape has dramatically changed so that the covenant may now limit opportunity for increased grocery store competition. Thus, the extent to which the public interest in unrestrained competition is adversely affected by the burden on this one parcel remains an issue of fact for trial.

### 8. Changed Circumstances

The inquiry into changed circumstances must be superimposed over the inquiry into the previous seven factors. The New Jersey Supreme Court succinctly described this process as follows:

> The trial court must first determine whether the covenant was reasonable at the time it was enacted. If it was reasonable then, but now adversely affects commercial development and the public welfare ..., the trial court may consider whether allowing damages for the breach of the covenant is an appropriate remedy.

*Davidson*, 121 N.J. at 215, 579 A.2d at 297. The court in Davidson cautioned that the fact-sensitive nature of changed circumstances inquiry makes summary judgment generally inappropriate. *Id.* at 214, 579 A.2d at 297.

Acme contends that changed circumstances are limited to circumstances where the benefit to the dominant estate has ceased

---

14. Whether conditions have changed to render the covenant unreasonable as to duration is not decided here, but is addressed *infra* in terms of changed circumstances.

to exist.[15] Wharton argues that the changed circumstances are the increased burden of the covenant which results from external factors. Both arguments have merit and can be reconciled in a simple analysis: Does the retained benefit of the covenant exceed the increased burden of the restriction? As a factor in this analysis we must decide whether Acme has already received the benefit of its bargain. Next, we must determine the extent to which circumstances have changed increasing the burden on Wharton.

Again, genuine issues of material fact preclude a finding as a matter of law with respect to changed circumstances. As we noted above, an issue of fact remains as to whether alternative sites exist. This issue is genuine and material to our inquiry into the increased burden on Wharton. Thus, because a reasonable fact finder could find in favor of Wharton on the facts presented, we must deny the defendants' motion for summary judgment.

■ In sum, we find that genuine issues of material fact remain on several of the *Davidson* factors. Material facts remain, which are actually and in good faith controverted, with regard to whether consideration was paid for the covenant, whether the covenant imposed or imposes an unreasonable restraint on trade, whether the public interest is adversely affected by the covenant and whether circumstances have changed such that enforcement is no longer reasonable. However, no substantial dispute remains as to the issues of intent, clarity, notice, and reasonableness of geographic scope or duration at the time the covenant was drafted and, for the purposes of trial, these issues shall be deemed resolved as outlined above.

## III. CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment will be granted in part and denied in part. All claims by Wharton arising under the state and federal antitrust laws are dismissed for lack of standing. We will grant the defendants' motion for summary judgment with respect Giant's claims arising under Section 2 of the Sherman Antitrust Act. The defendants' motion for summary judgment is denied with respect to Giant's claims arising under Section 1 of the Sherman Antitrust Act and the New Jersey Antitrust Act, N.J.S.A. § 56:9–3, and with respect to plaintiffs' claims under New Jersey common law.

## ON MOTION FOR RECONSIDERATION

This matter having come before the court on an oral motion by Giant Food, Inc., pursuant to General Rule 12I, for reconsideration of the court's findings at page 18 of its summary judgment opinion dated March 21, 1995, concerning the definition of the relevant geographic market; and the court having considered oral argument pertaining to newly discovered evidence; and for good cause shown in an oral opinion given on even date herewith;

IT IS on this 28th day of March, 1995 hereby

ORDERED that the motion of Giant Food, Inc. for reconsideration is GRANTED; and it is further

ORDERED that the findings in the opinion dated March 18, 1995 are hereby amended to reflect, for purposes of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and N.J.S.A. § 56:9–3, that genuine issues of material fact exist with respect to whether the relevant geographic market is as small as the Medford area; and it is further

ORDERED that this amendment shall not effect those findings contained in the court's opinion dated March 21, 1995, which bear on plaintiffs' claims under Section 2 of the Sher-

---

**15.** We cannot reconcile Acme's position with the decision in *Davidson*. Though the *Davidson* court cited with approval the case of *Welitoff v. Kohl*, 105 N.J.Eq. 181, 147 A. 390 (1929), the clear focus of the *Davidson* changed circumstances analysis is not so one sided. *Welitoff* stands for the proposition that the owner of the dominant estate will not be heard in equity for the enforcement of a covenant from which he no longer derives benefit. 105 N.J.Eq. at 186–87, 147 A. at 392–93. However, *Davidson* does not indicate that the only covenants which can be found unreasonable because of changed circumstances are those from which the dominant estate no longer benefits. Rather, retained benefit to the dominant estate is an important consideration in the analysis though not the sole inquiry.

man Antitrust Act, 15 U.S.C. § 2, N.J.S.A. § 56:9–4, or New Jersey Common law claims.